**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RONALD F. SKAFF, derivatively on behalf of EOS ENERGY ENTERPRISES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH NIGRO, JOSEPH MASTRANGELO, JEFFREY BORNSTEIN, CLAUDE DEMBY, ALEX DIMITRIEF, JEFFREY MCNEIL, GREGORY NIXON, NICK ROBINSON, MARIAN "MIMI" WALTERS, DAVID URBAN, and NATHAN KROEKER, <br><br> Defendants, <br><br> -and- <br><br> EOS ENERGY ENTERPRISES, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiff Ronald F. Skaff ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant EOS Energy Enterprises, Inc. ("EOS" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers (the "Individual Defendants", defined herein), seeking to remedy the Individual Defendants' breaches of fiduciary duties under Delaware law and violations of federal law. Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by EOS with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly

1

available filings in lawsuits including but not limited to the pending securities fraud class action in this Court captioned *Yung v. EOS Energy Enterprises, Inc.*, *et al.,* Case No. 2:26-cv-02372 (the "Securities Action"), and other matters of public record.

## **INTRODUCTION**

1.      This stockholder derivative action is brought for the benefit of nominal defendant EOS Energy Enterprises, Inc. ("EOS" or the "Company") against the Individual Defendants, all of whom are current and/or former officers and directors of EOS, based on non-exculpable breaches of their fiduciary duties and other serious misconduct from approximately November 2025 through February 2026 (the "Relevant Period").

2.      According to its public filings, nominal defendant EOS, a Delaware corporation headquartered in Edison, New Jersey, is focused on the manufacture of safe, sustainable zinc-based energy storage systems for utility, microgrid, and commercial applications. The Company's Znyth® technology (aqueous zinc-ion) serves as a 3- to 12-hour alternative to the popular lithium-ion storage products, primarily batteries.  EOS was founded in 2008 and went public in November 2020 via a "de-SPAC" merger with B. Riley Principal Merger Corp. II, rather than a traditional initial public offering (IPO).  The Company's goal, per its public filings, is for its product to develop as a leading alternative to the overwhelmingly popular lithium-ion technology used by artificial intelligence (AI) data centers, and many industrial applications.

3.      The Company's marketing opportunity is premised on a variety of flaws it perceives which afflict lithium-ion products.  In the Company's 2025 Annual Report on SEC Form 10-K (the "2025 10-K"), the Individual Defendants stated: "There is growing industry-wide concern regarding the safety risks associated with lithium-ion batteries, including incidents of thermal runaway, fires, and explosions. Lithium-ion batteries are vulnerable to internal short

circuits and thermal instability due to the flammable nature of their electrolytes, which can lead to significant safety incidents and have prompted intensified regulatory scrutiny. In contrast, our battery technology is designed without these characteristics, offering a significantly enhanced safety profile and reinforcing our commitment to reliable and secure energy storage solutions." (2025 10-K at 5).

4.     However, launching a new technology on this scale requires enormous resources. As the Individual Defendants stated on page 13 of that same 2025 Form 10-K:

> We have had net losses and negative operating cash flows each fiscal quarter since inception of our business. For the years ended December 31, 2024 and 2023, we had $685.9 million and $229.5 million in net losses, respectively. We expect to continue to incur losses and experience negative operating cash flows for the foreseeable future, as we anticipate continued investment in the development and launch of product with outside capital at the expense of short-term profitability. For the fiscal year ended December 31, 2024, the Company concluded that there was substantial doubt about its ability to continue to operate as a going concern for the 12 months following the issuance of these Consolidated Financial Statements.

5.     By the spring of 2025, it appeared that EOS was making substantial progress, and the Individual Defendants issued revenue guidance for fiscal year 2025 in the range of $150-190 million.  Cash reserves grew after the Individual Defendants caused the Company to close on a $303.5 million U.S. Department of Energy ("DOE") loan guarantee.  As one commentator noted: "EOS is chasing what's at least a $56 billion market opportunity for battery storage by 2027 as renewables ramp up their contribution to the US energy grid."

6.     By the fall of 2025, EOS boasted a $600 million order backlog.  Analysts cautioned, however, that "the company is burning through cash and has to rely on external funding."

7.     By the final months of 2025, under the Individual Defendants' direction, EOS was evaluating and seeking to secure huge funding opportunities. These efforts were bolstered by optimistic public reports issued by the Individual Defendants.

8.      For example, in the Company's third quarter of 2025 earnings press release, the Individual Defendants stated: "***The Company expects full year revenue in the range of $150 million to $160 million,*** consistent with the low end of its previously forecasted range. In recent months, EOS has advanced the implementation of subassembly automation at its Turtle Creek manufacturing facility, with all equipment now on site and 88% of its bipolar lines in commercial production. ***This automation, combined with increasing throughput on the Company's first state-of-the-art manufacturing line, positions EOS to ramp production to an annualized rate of two GWh per year by year-end 2025 and more than triple its output in the fourth quarter.***"

9.      On a November 6, 2025 earnings call, defendant Joseph Mastrangelo ("Mastrangelo"), the Company's longtime Chief Executive Officer ("CEO") and a Board member, highlighted the Company's record-setting quarter, stating, "You've seen our best quarter-to-date on revenue in the history of the company. It's a phenomenal performance by the team in the third quarter." Defendant Mastrangelo emphasized the commercial pipeline's growth, recent order wins, and the strategic agreement with Talen Energy, as well as the move to a new optimized production facility aiming to lower costs and improve scalability. Defendant Mastrangelo noted, "This new building gives us an optimized footprint to build a world-class factory to take cycle times down to drive cost down and to get this product where it should be as a market leader, both on performance and cost."

10.     In addition, the Company's Interim Chief Financial Officer ("CFO") and Chief Commercial Officer ("CCO"), defendant Nathan Kroeker ("Kroeker"), reported: "We again delivered record quarterly revenue as production volumes continued to ramp with gross margins improving sequentially for the past 4 quarters."

11.     Moreover, during that same call, defendant Mastrangelo reiterated the Company's full-year revenue guidance, stating, "We're on track to earn between $150 million and $160 million in revenue for the total year."

12.     On the basis of the Individual Defendants' positive public statements, the Company's stock price shot up from $14.10 on November 4, 2025 to $14.86 on November 5, 2025 and then to $15.29 on November 6, 2025 with momentum continuing on November 7, 2025 leading to a close that day of $18.26.

13.     This promising news, and the rosy projections, enabled EOS to raise an astounding amount of money on November 20, 2025. The Individual Defendants caused EOS to announce as follows that day:

> EOS Energy Enterprises, Inc. (NASDAQ: EOSE) ("EOS" or the "Company") today announced the pricing of a registered direct offering (the "Offering") of 35,855,647 shares of common stock at a price of $12.78 per share to a limited number of purchasers. The Offering is being made pursuant to the Securities Act of 1933, as amended (the "Securities Act"). The Offering is expected to close on November 24, 2025, subject to customary closing conditions.
>
> The proceeds from the Offering are expected to be approximately $458.2 million. The Company intends to use the proceeds from the Offering, together with the net proceeds from the Concurrent Notes Offering (as defined below), (i) to repurchase a portion of EOS's outstanding 6.75% convertible senior notes due 2030 (the "Existing 2030 Convertible Notes") as described below; and (ii) for general corporate purposes.
>
> EOS also announced today the pricing of its previously announced private offering of $525,000,000 aggregate principal amount of 1.75% convertible senior notes due 2031 (the "notes"), plus up to an additional $75,000,000 aggregate principal amount of notes that the initial purchasers of the notes offering have the option to purchase (the "Concurrent Notes Offering"). The Concurrent Notes Offering is expected to close on November 24, 2025, subject to customary closing conditions.
>
> Concurrently with the pricing of the Offering, EOS entered into one or more separate, privately negotiated transactions with a limited number of holders of the Existing 2030 Convertible Notes to repurchase 200.0 million aggregate principal amount of the Existing 2030 Convertible Notes for an aggregate repurchase price of approximately $564.6 million, which includes accrued and unpaid interest on the

Existing 2030 Convertible Notes to be repurchased (the "Repurchases"). The terms of each Repurchase depended on a variety of factors, including the market price of EOS's common stock and the trading price of the Existing 2030 Convertible Notes at the time of such Repurchase, and the Repurchase is subject to closing conditions that may not be satisfied. Following the completion of the Offering, EOS may repurchase additional Existing 2030 Convertible Notes.

14. Unfortunately, however, major fourth quarter issues were being concealed by the Individual Defendants. On February 26, 2026, the Company's stock took a nosedive after fourth quarter and full-year 2025 results fell well short of consensus expectations and the Individual Defendants' projections.

15. Thus, on February 26, 2026, before the market opened, the Individual Defendants caused EOS to announce its fourth quarter and full year 2025 results, reporting, among other things, full year 2025 revenue of $114.2 million, falling far short of the previously-issued guidance of $150 million to $160 million for fiscal year 2025 revenue. The Individual Defendants further reported a "gross loss of $143.8 million," a "net loss attributable to shareholders of $969.6 million," and an "adjusted EBITDA loss of $219.1 million." The Individual Defendants acknowledged that the "full year's revenue was below expectations," and further disclosed that the Company's "capacity milestone was reached 5 weeks later than initially planned."

16. During the earnings conference calls held in conjunction with fourth quarter and full year 2025 results on the same date, the Company's Chief Operating Officer ("COO"), John Mahaz ("Mahaz"), disclosed that certain "issues prevented us from delivering our commitments," including that "battery line downtime ran well above industry norms, the design intent of the line and our internal forecast," and "the ability for the automated bipolar production to hit quality targets took longer than expected. That drove rework and lost revenue."

17.    On this news, the Company's stock price fell by $4.39, or more than *39%*, to close at $6.74 per share on February 26, 2026.  The Company's stock price has only continued to fall ever since, and currently trades for approximately $5.25 per share.

18.    During the Relevant Period, the Individual Defendants breached their non-exculpable duties of loyalty and good faith by issuing a series of materially false and misleading statements to stockholders, ultimately exposing EOS to large liabilities to injured investors, as have been recently sought in the Securities Action.

19.    As alleged with particularity herein, under Delaware law, there is reason to doubt that at least half of the members of the Company's current Board could respond disinterestedly and/or independently to a litigation demand.  As a result, this derivative action brought against the Individual Defendants for the benefit of EOS should proceed.

20.    Plaintiff seeks by this action to recover derivatively for the damages the Individual Defendants' actions and omissions have caused.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) insofar as this action arises under sections 10(b) and 21D of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

22.     Prior to Congress having enacted an express provision for contribution under section 21D of the Exchange Act, the United States Supreme Court recognized that a federal cause of action existed for contribution pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5. *See Musick, Peeler & Garrett v. Employers Ins. Of Wausau*, 508 U.S. 286 (1993).  Thus,

pursuant to federal statutory law and Supreme Court authority, this Court has original federal question jurisdiction over the federal contribution claim.

23.     This Court also has subject matter jurisdiction over the pendent Delaware state law claims asserted herein pursuant to 28 U.S.C. §1367 (supplemental jurisdiction), since this statute provides that the district court has supplemental jurisdiction over all other claims where, as here, they are so related to claims in the action within the original jurisdiction of the Court, that they form part of the same case or controversy.

24.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

25.     This Court has personal jurisdiction over each defendant because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because acts and offenses pertinent to the causes of action stated herein were committed in part in this jurisdiction.

## THE PARTIES

25.     Plaintiff has held EOS stock continuously since at least February 2025.

26.     Nominal defendant EOS is incorporated under the laws of Delaware with its principal executive offices located in Edison, New Jersey. The Company's common stock trades on the NASDAQ CM market under the symbol "EOSE."

8

27.      Defendant Joseph Nigro ("Nigro") has served as a member of the Board since March 2025, and currently serves as Chairman of the Board.  In addition, defendant Nigro serves as a member of the Board's Audit Committee (the "Audit Committee").

28.      Defendant Mastrangelo has served as the Company's CEO since 2019 and has served as a member of the Board since 2018.  Defendant Mastrangelo is a named individual defendant in the Securities Action.

29.      Defendant Jeffrey Bornstein ("Bornstein") has served as a member of the Board since 2022.  Defendant Borstein has also served as a member of the Audit Committee.

30.      Defendant Claude Demby ("Demby") has served as a member of the Board since August 2021.  Defendant Demby has also served as a member of the Audit Committee.

31.      Defendant Alex Dimitrief ("Dimitrief") has served as a member of the Board since November 2020.  Defendant Dimitrief has also served as a member of the Audit Committee.

32.      Defendant Jeffrey McNeil ("McNeil") has served as a member of the Board since October 2023.  Defendant McNeil has also served as a member of the Audit Committee.

33.      Defendant Gregory Nixon ("Nixon") has served as a member of the Board since July 2024.

34.      Defendant Nick Robinson ("Robinson") has served as a member of the Board since June 2024.

35.      Defendant Marian "Mimi" Walters ("Walters") has served as a member of the Board since November 2020.

36.      Defendant David Urban ("Urban") has served as a member of the Board since December 2024.

9

37.    Defendant Kroeker served as the Company's CFO from January 2023 until March 2025, when he became the Company's CCO, a position he continues to hold.  Nonetheless, since May 2025, defendant Kroeker has also served as the Company's Interim CFO.  Defendant Kroeker is a named individual defendant in the Securities Action.

38.    Defendants Nigro, Bornstein, Demby, Dimitrief, McNeil, and Urban are sometimes collectively referred to herein as the "Audit Committee Defendants."  The Audit Committee Charter provides that the Audit Committee: "shall discuss with management and the independent auditor and, prior to issuance, review and approve the Company's earnings releases, including the financial information, use of any "pro forma" or "adjusted" non-GAAP information, and earnings guidance (if such is provided) to be disclosed in such releases, and discuss with management other significant financial information to be provided to analysts or rating agencies."

39.    Defendants Mastrangelo and Kroeker are sometimes referred to herein as the "Securities Action Defendants."

40.    Defendants Nigro, Mastrangelo, Bornstein, Demby, Dimitrief, McNeil, Nixon, Robinson, Walters, Urban, and Kroeker are collectively referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

41.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as

10

to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

43.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

44.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

   i.   manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

   ii.  neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

   iii. establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

iv. neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

v. ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

vi. conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

vii. ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

viii. remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

45. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their

duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

## SUBSTANTIVE ALLEGATIONS

46. EOS, a Delaware corporation headquartered in Edison, New Jersey, was formed to develop an innovative brand of zinc-based battery storage technology that could compete on a variety of levels with traditional ion-based batteries.

47. On November 16, 2020, a press release was issued announcing that EOS had been funded and would become an independent, publicly traded company via a "de-SPAC" transaction. That announcement stated:

> B. Riley Principal Merger Corp. II (NYSE: BMRG, BMRG WS, BMRG.U) ("BMRG"), a special purpose acquisition company sponsored by an affiliate of B. Riley Financial, Inc. (Nasdaq: RILY) ("B. Riley Financial"), and EOS Energy Storage, LLC, a leading manufacturer of safe, reliable, low-cost zinc battery storage systems, today announced the completion of their previously announced business combination. The business combination has a projected pro forma market capitalization of approximately $500 million.
>
> Upon completion of the business combination, the combined company was renamed EOS Energy Enterprises, Inc. ("EOS" or the "Company"). Beginning November 17, 2020, the Company's shares of common stock and warrants will begin trading on The Nasdaq Capital Market under the new ticker symbols "EOSE" and "EOSEW", respectively.
>
> EOS's executive management team will continue to be led by Joe Mastrangelo, who will serve as the Company's Chief Executive Officer, and Sagar Kurada, who will serve as the Company's Chief Financial Officer. The Company's board of directors will be comprised of Joe Mastrangelo, Russell Stidolph, chairman of the board since 2018, Dan Shribman, B. Riley Financial's Chief Investment Officer and BMRG's former Chief Executive Officer, Alex Dimitrief, former President and Chief Executive Officer of General Electric's Global Growth Organization, Dr. Krishna Singh, founder of Holtec International, Marian "Mimi" Walters, Chief Commercial Officer for Leading Edge Power Solutions, LLC and Audrey Zibelman, Chief Executive Officer at the Australian Energy Market Operator.

"This milestone is the culmination of more than a decade of commitment to addressing the world's energy storage challenges," said Mr. Mastrangelo. "We have a proven, safe and sustainable storage solution that's ready to help accelerate and scale the clean energy transition. We are grateful to the B. Riley team for their partnership and support over these last few months and we look forward to sharing our progress with our shareholders as we continue to execute on our growth strategy."

"In EOS we found an ideal partner to complete this business combination," said Mr. Shribman. "The market opportunity for EOS is extremely promising. They are a mission-driven organization focused on accelerating clean energy adoption, and importantly, they have the technology to make this happen. We wouldn't have been able to close this transaction so quickly without the tireless work of the entire EOS team as well as the continued support of our financial partners and shareholders. We're proud to be a strategic partner as EOS looks toward a bright future ahead."

**About EOS Energy Enterprises, Inc.**

EOS Energy Enterprises, Inc. is accelerating the shift to clean energy with positively ingenious solutions that transform how the world stores power. Our breakthrough Znyth® aqueous zinc battery was designed to overcome the limitations of conventional lithium-ion technology. Safe, scalable, efficient, sustainable—and manufactured in the U.S—it's the core of our innovative systems that today provide utility, industrial, and commercial customers with a proven, reliable energy storage alternative. EOS was founded in 2008 and is headquartered in Edison, New Jersey

48.    Launching this novel technology was a daunting task financially. In 2019, EOS suffered a net loss of over $70 million, followed by a 2020 net loss almost as high, $68.7 million.

49.    Although the market was skeptical, as of the Company's earnings report for the third quarter of 2021, its current backlog was $151.8 million, with $137.4 million coming in the first nine months of 2021.

50.    EOS saw fiscal year 2022 revenues from the sale of zinc-based batteries grow by four times over fiscal year 2021.  Booked orders increased by 2.5 times to $338.6 million, with an order backlog of $463.8 million as of the end of the fourth quarter of 2022.  Still, losses were very high, and more cash needed to be raised.

51.     By mid-2023, EOS had seen a 168% increase in revenue, reaching $8.8 million, due to increased demand in the energy storage industry and efficient production.  In addition, EOS then had a backlog of over $500 million in orders and a goal to reach between $600 and $800 million by 2023, but the Company was still far from profitable.

52.     By the end of 2023, booked orders grew by $86.9 million and revenues grew to $700,000 for the third quarter, while expectations were that in 2023, EOS would deliver revenues of $17.9 million.

53.     In mid-2024, the Individual Defendants reiterated the Company's full-year revenue target of $60 million to $90 million.  Certain performance milestones had been reached, unlocking additional funding, and attempts were being made to close on a DOE loan of close to $400 million.

54.     On December 3, 2024, the Individual Defendants caused EOS to announce a large boost in funding:

> EOS Energy Enterprises, Inc. (NASDAQ: EOSE) ("EOS" or the "Company"), a leading provider of safe, scalable, efficient, and sustainable zinc-based long duration energy storage systems, today announced the successful closing of a $303.5 million loan guaranteed by the U.S. Department of Energy's ("DOE") Loan Programs Office ("LPO") ("the DOE loan"), marking the first Title 17 battery loan closed under the current administration. The DOE loan is a key step in advancing Project American Made Zinc Energy (AMAZE) and is expected to fund the expansion of EOS' manufacturing capacity to 8 GWh by 2027 to meet the growing demand for longer duration battery energy storage systems.
>
> "Five years ago, we made the strategic decision to bring our manufacturing operations back to the U.S. from China – a move that has been transformative to our business and positioned EOS at the forefront of the American manufacturing renaissance," said EOS Chief Executive Officer Joe Mastrangelo. "Since then, we've made significant advancements in our battery technology, retooled our manufacturing facilities for greater efficiency, and established a U.S.- based supply chain with over 90% domestic content, all of which has brought us to this milestone today with the DOE. The DOE loan provides capital to scale our operations to meet the surging demand for reliable, long-duration energy storage solutions, all while supporting American manufacturing.

55.    On July 1, 2025 a second DOE loan advance was announced by the Individual Defendants:

EOS Energy Enterprises, Inc. (NASDAQ: EOSE) ("EOS" or the "Company"), an American energy company and the leading innovator in designing, sourcing, manufacturing, and providing zinc-based battery energy storage systems (BESS) manufactured in the United States, today announced that it has received its second loan advance from the Department of Energy's (DOE) Loan Programs Office in the amount of $22.7 million. With this advance, the Company has fully drawn the maximum allowable amount under the first tranche of $90.9 million in connection with the completion of its first state-of-the-art manufacturing line.

The loan advance covers 80% of eligible costs, incurred as part of the Company's production expansion plans related to Project AMAZE. These funds support EOS' ongoing efforts to expand its operational capacity to meet growing customer demand and further its strategic growth objectives.

"Production volumes at our first state-of-the-art manufacturing line are growing every week as we progress toward realizing the full 2 GWh capacity on Line 1," said Nathan Kroeker, EOS Chief Commercial Officer and Interim Chief Financial Officer. "The loan proceeds from the DOE, which follow the recently upsized convertible notes and common stock offerings, continue to strengthen our financial position and position us to scale U.S. production, and advance the build out of our second state of the art manufacturing line."

56.    Still, the Company's operating losses for the six months ending June 30, 2025 topped $116 million.   By the quarter ending September 30, 2025, EOS was down to just $57.8 million in cash, over $400 million less than in the same period for the prior year.  The Company's quest for significant funding was far from over.

57.    On November 5, 2025, the Individual Defendants caused EOS to announce news that significantly buoyed the market.  In that day's press release, the Individual Defendants touted the Company's financial and operational results, as well as its 2025 fiscal year outlook, as follows in relevant part:

**Third Quarter Highlights**

• *Record quarterly revenue of $30.5 million, a 100% increase compared to the prior quarter and up 35x from the same period last year, as production efficiencies continue to improve.*

16

*Gross loss of $33.9 million compared to $31.0 million in the prior quarter, a 92-point margin improvement, driven by increased production volumes and improved project margins.*

• Operating expenses totaled $27.3 million, $5.6 million lower than prior quarter.

• Net loss attributable to shareholders totaled $641.4 million, driven primarily by a $572.3 million cumulative non-cash impact from the changes in fair value tied to mark-to-market adjustments driven by 122% increase in the Company's stock price as of September 30, 2025, and the corresponding loss recorded for the early retirement of convertible notes with a 26.5% interest rate.

• Adjusted EBITDA loss of $52.7 million compared to $51.6 million in the prior quarter, a 166-point improvement on improved manufacturing variable cost utilization.

• Total cash of $126.8 million, including restricted cash, as of September 30, 2025.

• Commercial opportunity pipeline of $22.6 billion, an increase of 21% compared to prior quarter and 59% compared to September 30, 2024, with $644.4 million of orders in backlog as of September 30, 2025.

\*\*\*\*

**2025 Outlook**

*The Company expects full year revenue in the range of $150 million to $160 million,* consistent with the low end of its previously forecasted range. In recent months, EOS has advanced the implementation of subassembly automation at its Turtle Creek manufacturing facility, with all equipment now on site and 88% of its bipolar lines in commercial production. *This automation, combined with increasing throughput on the Company's first state-of-the-art manufacturing line, positions EOS to ramp production to an annualized rate of two GWh per year by year-end 2025 and more than triple its output in the fourth quarter.*

58.    On November 5, 2025, the Individual Defendants caused the Company to publish a presentation for stockholders in connection with reporting its fiscal third quarter 2025 results. In that presentation, the Individual Defendants reiterated their confidence in the Company's full year 2025 guidance and further touted the Company's purported operational efficiencies as follows, in relevant part:



\*     \*     \*



\*     \*     \*



59.     According to the allegations that have been raised to date in the Securities Action, these assertions were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to stockholders: (1) that the Company was unable to achieve the ramp up in production and capacity utilization required to achieve the previously set guidance; (2) the Company's battery line downtime was running well above industry norms, the design intent of the line, and internal forecasts; (3) the Company was experiencing delays in the ability for its automated bipolar production to hit quality targets; (4) the Company's inadequate systems and processes prevented it from ensuring reasonably accurate guidance and that its public disclosures were timely, accurate, and complete; and (5) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects during the Relevant Period were materially misleading and/or lacked a reasonable basis.

60.     However, before any adverse news was revealed to stockholders, the Company was able to raise an enormous sum of money.  On November 20, 2025, the Individual Defendants caused the Company to announce the following:

> EOS Energy Enterprises, Inc. (NASDAQ: EOSE) ("EOS" or the "Company") today announced the pricing of a registered direct offering (the "Offering") of 35,855,647 shares of common stock at a price of $12.78 per share to a limited number of purchasers. The Offering is being made pursuant to the Securities Act of 1933, as amended (the "Securities Act"). The Offering is expected to close on November 24, 2025, subject to customary closing conditions.
>
> The proceeds from the Offering are expected to be approximately $458.2 million. The Company intends to use the proceeds from the Offering, together with the net proceeds from the Concurrent Notes Offering (as defined below), (i) to repurchase a portion of EOS's outstanding 6.75% convertible senior notes due 2030 (the "Existing 2030 Convertible Notes") as described below; and (ii) for general corporate purposes.

EOS also announced today the pricing of its previously announced private offering of $525,000,000 aggregate principal amount of 1.75% convertible senior notes due 2031 (the "notes"), plus up to an additional $75,000,000 aggregate principal amount of notes that the initial purchasers of the notes offering have the option to purchase (the "Concurrent Notes Offering"). The Concurrent Notes Offering is expected to close on November 24, 2025, subject to customary closing conditions.

Concurrently with the pricing of the Offering, EOS entered into one or more separate, privately negotiated transactions with a limited number of holders of the Existing 2030 Convertible Notes to repurchase 200.0 million aggregate principal amount of the Existing 2030 Convertible Notes for an aggregate repurchase price of approximately $564.6 million, which includes accrued and unpaid interest on the Existing 2030 Convertible Notes to be repurchased (the "Repurchases"). The terms of each Repurchase depended on a variety of factors, including the market price of EOS's common stock and the trading price of the Existing 2030 Convertible Notes at the time of such Repurchase, and the Repurchase is subject to closing conditions that may not be satisfied. Following the completion of the Offering, EOS may repurchase additional Existing 2030 Convertible Notes.

61.    On February 26, 2026, before the market opened, the Individual Defendants caused EOS to announce its fourth quarter and full year 2025 results, reporting, among other things, full year 2025 revenue of $114.2 million, falling far short of the previously issued guidance of $150 million to $160 million for fiscal year 2025 revenue. The Individual Defendants further reported a "gross loss of $143.8 million," a "net loss attributable to shareholders of $969.6 million," and an "adjusted EBITDA loss of $219.1 million." The Individual Defendants acknowledged that the "full year's revenue was below expectations," and further disclosed that the Company's "capacity milestone was reached 5 weeks later than initially planned." Specifically, the press release stated as follows, in relevant part:

**Full Year 2025 Highlights**

• *Revenue of $114.2 million, more than 7x 2024, driven by scaled production of the company's first generation highly automated manufacturing process and a 609% increase in customer deliveries*.

Gross loss of $143.8 million, improving margins by 408 points, as manufacturing volumes increased and Z3 production costs declined. Adjusted gross loss was $128.5 million.

• Net loss attributable to shareholders of $969.6 million, driven primarily by $746.8 million or 77% non-cash items related to fair value accounting, capital structure optimization, and other items such as stock-based compensation and depreciation.

• Adjusted EBITDA loss of $219.1 million, compared to $156.6 million in 2024, an 812-point margin improvement, driven by ongoing operational efficiencies, leverage, and cost reductions.

* * *

**Recent Business Highlights**

Record Operational Performance

EOS exited 2025 with 2 GWh of annualized production capacity achieved through continued automation, subassembly integration, and manufacturing process optimization. Although the ***capacity milestone was reached 5 weeks later than initially planned,*** the Company accelerated operational execution throughout the second half of the year, achieving production records across all operations. While ***full year's revenue was below expectations,*** execution accelerated significantly with record fourth quarter revenue and year-over-year shipments increasing 659%.

62.     During the Company's earnings conference calls held in conjunction with fourth quarter and full year 2025 results on the same date, the Company's COO Mahaz disclosed that certain "issues prevented us from delivering our commitments," including that "battery line downtime ran well above industry norms, the design intent of the line and our internal forecast," and "the ability for the automated bipolar production to hit quality targets took longer than expected. That drove rework and lost revenue." Specifically, Mahaz stated as follows, in relevant part:

> ***Ultimately, 3 very fixable issues prevented us from delivering our commitments.*** First, we had one isolated supplier nonperformance that cost us a week of production. We addressed it directly, working closely with our supplier to quickly identify root causes and corrective actions. We implemented better controls internally and at our suppliers. That specific issue is behind us. Second, ***the ability for the automated bipolar production to hit quality targets took longer than expected. That drove rework and lost revenue.*** We improved tooling, reduced variation in the automation process and tightened material specifications to stabilize bipolar production. We have also added laser detection to give us better visibility and control of any process variation

***Third, our battery line downtime ran well above industry norms, the design intent of the line and our internal forecast.*** Best-in-class operations and ***our expectation is to run at roughly 10% equipment downtime***. That's my expectation, and that's the expectation of our automation partners. As we push utilization higher throughout the year and ran the line for more hours, ***we were closer to the mid-30% range.*** Working closely with our automation partners, we addressed issues with our robotics, hardware, controls, maintenance schedules and spare parts. We have also improved our technical capability and strengthened our team to improve time to resolution.

63.     On this news, the Company's stock price fell by $4.39, or more than ***39%***, to close at $6.74 per share on February 26, 2026.  The stock has not recovered – to the contrary, it has only continued to fall, and currently trades for approximately $5.25 per share.

64.     Shortly after the February 26, 2026 announcements and resulting stock drop, the following was reported:

Guggenheim analyst Joseph Osha downgraded shares to Neutral from Buy, saying EOS Energy (EOSE) is making operational progress, ***but management is "not paying sufficient attention to financial forecasting and public targets,"*** resulting in "***disjointed and inconsistent financial information."***  The problem for EOS Energy (EOSE) investors is ***"the company's continued inability to provide reasonable forecasts for its business,"*** saying management was ***"confidently reiterating a higher number well into the quarter, when manufacturing operations would have already been experiencing problems,"*** Osha wrote. (Emphasis added).

65.     Analyst Henrik Alex similarly observed: "For my part, I wasn't exactly surprised by the poor performance, ***as the company has never delivered upon any sort of financial guidance provided by management in recent years.***

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

66.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

22

67.    Plaintiff is a current stockholder of the Company, has continuously held shares of the Company's stock since at least February 2025, and was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

68.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

69.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

70.    The Board currently consists of ten (10) directors: defendants Nigro, Mastrangelo, Bornstein, Demby, Dimitrief, McNeil, Nixon, Robinson, Walters, and Urban.    A derivative plaintiff need only demonstrate reason to doubt that a majority of the corporation's directors are disinterested or objective in order to establish pre-suit demand excusal.    Plaintiff has adequately alleged that there is reason to doubt that at least five (5) current directors of EOS are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

71.    There is reason to doubt that defendant Mastrangelo could respond independently to a demand because his principal professional occupation is his position as the Company's CEO. In connection with his role as the Company's CEO, defendant Mastrangelo has received and continues to receive substantial monetary compensation and other valuable benefits.    No reasonable stockholder would believe that defendant Mastrangelo is capable of impartially considering a demand to commence and vigorously prosecute this action against those Individual Defendants who control his compensation, especially given that in the Company's most recent

annual proxy statement on SEC Form DEF 14A, disseminated to stockholders on March 27, 2025, the Board admitted that defendant Mastrangelo is not an independent director.

72.     There is also reason to doubt that defendant Mastrangelo could respond disinterestedly to a demand because he faces a substantial likelihood of liability for breach of fiduciary duty based on the allegations set forth herein, including allegations that he repeatedly issued false and misleading statements to stockholders, in violation of his non-exculpable duties of loyalty and good faith.  Accordingly, notwithstanding that there is reason to doubt defendant Mastrangelo's independence, there also is reason to doubt that defendant Mastrangelo is capable of disinterestedly considering a demand.

73.     Demand is also excused as to the six Audit Committee Defendants -- Nigro, Bornstein, Demby, Dimitrief, McNeil, and Urban -- who each face a substantial likelihood of liability.  As alleged herein, defendants Nigro, Bornstein, Demby, Dimitrief, McNeil, and Urban served during the Relevant Period, and continue to serve, as members of the Audit Committee. Per its charter, the Audit Committee is responsible for monitoring the Company's corporate financial statements and reporting.  In their capacity as members of the Audit Committee during the Relevant Period, defendants Nigro, Bornstein, Demby, Dimitrief, McNeil, and Urban, among other things, caused and/or permitted the issuance of the series of false and misleading public statements made to stockholders complained of herein, caused and/or permitted EOS to adopt ineffective internal controls over its disclosure and financial reporting, and caused and/or permitted the Company's legal compliance failures complained of herein.  Accordingly, there is reason to doubt that defendants Nigro, Bornstein, Demby, Dimitrief, McNeil, and Urban would respond to a stockholder demand impartially and disinterestedly, and they each face a substantial likelihood of liability.

## COUNT I

**(Derivatively Against the Securities Action Defendants for Contribution Under Exchange Act Sections 10(b) and 21D of the Exchange Act)**

74.     Plaintiff repeats and realleges all previous allegations set forth above, as though fully set forth herein.

75.     The Securities Action Defendants, as directors and/or officers of EOS, and otherwise, had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about the Company  and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

76.     In addition, the Securities Action Defendants are liable under 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

## COUNT II

**Breach of Fiduciary Duty**
**(Against All Individual Defendants)**

77.     Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

78.     Each of the Individual Defendants owed the Company and its shareholders the highest duties of loyalty, good faith, honesty, and care in conducting their affairs and the business of the Company.

79.      Under the current circumstances, the Individual Defendants also had a duty to:

25

(a)    act in the interests of the Company and all of its equity owners; and

(b)    act in accordance with the fundamental duties of loyalty, care and good faith.

80.    Because of their respective positions with the Company, the Individual Defendants also are required to:

(a)    act independently to ensure that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder or even any interest the Company may have in raising funds if it cannot do so honestly; and

(b)    ensure that if there are conflicts of interest between the Individual Defendants' interests or the Company's financial interests and their fiduciary obligations of loyalty, that they are resolved in the best interest of the Company and its public shareholders.

81.    In causing or allowing the Company to fail to maintain adequate internal controls and procedures related to forecasts, forecast updates and public disclosures and by causing or allowing the misdeeds described herein, the Individual Defendants have not taken the required steps to protect the interests of the Company and, in fact, have breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

82.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in improper practices. The Individual Defendants had actual knowledge of the misstatements and omissions of material fact set forth in this Complaint, or acted with reckless disregard for the truth. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of EOS securities. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

83. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, EOS has sustained significant damages.

84. Accordingly, Plaintiff, as a shareholder of the Company, seeks monetary damages, injunctive remedies, and other forms of equitable relief on the Company's behalf.

85. Plaintiff and the Company have no adequate remedy at law.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment as follows:

A. Authorizing the maintenance of this action as a derivative action;

B. Declaring that the Individual Defendants have violated their fiduciary duties to the Company;

C. Awarding compensatory damages against the Individual Defendants individually and severally in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

D. Directing the Company to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events that occurred during the relevant time period;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

F. Granting such other or further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: March 25, 2026

By: _____

Gary S. Graifman

27

**KANTROWITZ, GOLDHAMER, &
GRAIFMAN, P.C.**
135 Chestnut Ridge Road
Suite 200
Montvale, NJ 07645
Telephone: 201-391-7000
Email: ggraifman@kgglaw.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Ave.
Ardmore, PA 19003
Telephone: 303-861-3003
Email: brett@shumanlawfirm.com

***Attorneys for Plaintiff Ronald F. Skaff***

28

**EOS Energy Enterprises, Inc. Verification**

I, Ronald F. Skaff, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint (the "Complaint"), and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

Date:        03 / 20 / 2026

_Ronald F. Skaff_

Doc ID: 2b3e3538292db851497d7769feb543453c640cfb